IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT SHOFFNER, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> MICHAEL WENEROWICZ, *et al.*, <br><br> *Defendants*. | CIVIL ACTION <br> NO. 15-00392 |

**PAPPERT, J.**                                                                                      **APRIL 27, 2016**

**<u>MEMORANDUM</u>**

  The Pennsylvania Board of Probation and Parole (the "Board") has the authority to grant parole to certain inmates in the state prison system. Being paroled allows the inmates, as parolees, to serve the balance of their sentence at liberty under the Board's supervision. The time that the parolee spends on parole is commonly known as "street time." Under Pennsylvania law, a parolee who commits any crime punishable by imprisonment while he or she is on parole is subject to reincarceration to serve the balance of the time owed on the sentence. When recalculating the parole violator's sentence upon his or her return to prison, the Board has the discretion to award the violator "street time credit." By the time the Board recalculates the sentence after awarding the street time credit, the revised maximum release date (the day the sentence ends) has sometimes already passed.

  This case involves two individuals, Robert Shoffner ("Shoffner") and Robert Thornton ("Thornton") (collectively "Plaintiffs"), who were arrested and convicted for crimes they committed while on parole for prior offenses. They were returned to prison, specifically to the State Correctional Institute at Graterford ("Graterford"), pending a hearing to determine their status as parole violators. The Board subsequently concluded that each violated the terms of his

1

parole, but in its discretion granted Shoffner and Thornton credit for the street time each had served prior to their arrest.  Since the Board's decision to award the street time credit resulted in a revised maximum release date that had already passed, they were both promptly released from prison.

Shoffner and Thornton sued Michael Wenerowicz ("Wenerowicz"), the facility manager at Graterford, and Kimberly Barkley ("Barkley"), the Secretary of the Board (collectively "Defendants"), contending that keeping them incarcerated beyond their maximum release dates violated their Eighth Amendment rights.[1]  They claim that "Defendants were deliberately and/or negligently indifferent to the Plaintiffs being falsely imprisoned past their maximum release dates."  (Am. Compl. ¶ 49, ECF No. 10.)  As a result, they allege that they "suffered deprivations of their liberty and other damages associated with false imprisonment."  (*Id.* ¶ 52.)

Defendants filed a motion for summary judgment, arguing that they did not violate Plaintiffs' Eighth Amendment rights because their revised maximum release dates could not have been known until the Board took certain actions.  (Defs.' Mot. Summ. J. at 5, ECF No. 21.)  Barkley and Wenerowicz also contend that they had insufficient personal involvement in the Plaintiffs' cases, and are in any event entitled to qualified immunity.  (*Id.*)  Plaintiffs moved for summary judgment on their claims against Barkley, alleging that she had personal knowledge of every Board decision as shown by her signature, which appears at the bottom of the decisions sent to Plaintiffs.  (Pls.' Mot. Summ. J. at 3, ECF No. 22.)  The Court heard oral argument on the motions on March 24, 2016, and has thoroughly reviewed the record.  (ECF No. 30.)  For the following reasons, Defendants' motion is granted and Plaintiffs' motion is denied.

---

[1]  Plaintiffs also named Wendy Shaylor as a defendant in her capacity as the grievance coordinator at Graterford.  (Am. Compl. ¶ 22, ECF No. 10.)  Plaintiffs agreed to remove Shaylor from the case because she was temporarily reassigned and was not involved in processing Thornton's grievance.  (Pls.' Opp. to Defs.' Mot. Summ. J. ("Pls.' Opp.") at 5, ECF No. 23; Hr'g Tr. at 4:23–5:5.)

**I.**

The Board has the authority to recommit a parolee who is convicted of a crime that occurred while he was at liberty on parole. 61 Pa. Cons. Stat. § 6138(a). A two-person panel (the "Board Panel") consisting of at least one Board member hears and decides questions on parole, reparole, return or revocation. 61 Pa. Cons. Stat. § 6113. Pursuant to 37 Pa. Code § 71.4, the Board must hold a revocation hearing within 120 days from the date it receives official verification of the conviction to determine whether a parolee violated the terms of his parole.

Prior to September 4, 2012, the Board could not award credit for a parole violator's street time. 61 Pa. Cons. Stat. § 6138 (amended Sept. 4, 2012). The Pennsylvania General Assembly amended Section 6138 and granted the Board the authority, in its discretion, to award credit to a convicted parole violator in certain circumstances for time they were at liberty on parole. 61 Pa. Cons. Stat. § 6138(a). The General Assembly amended Section 6138 again on January 2, 2013, but left intact the Board's authority to grant street time credit. 61 Pa. Cons. Stat. § 6138(a) ("The board may, in its discretion, award credit to a parolee recommitted under paragraph (2) for the time spent at liberty on parole . . . .").

After the revocation hearing, the Board Panel issues a hearing report in which it indicates whether it has awarded credit to the convicted parole violator for time spent on parole pursuant to Section 6138. (Defs.' Mot. Summ. J., Ex. 5 ("Johnson Dep.") 30:4–31:3; Defs.' Mot. Summ. J., Ex. 6 ("MacNamara Dep.") 20:13–21:2.) The Board Panel then forwards the hearing report to the Office of the Board Secretary, where technicians calculate the convicted parolee violator's new sentence. (Johnson Dep. 9:8–22:15; MacNamara Dep. 15:8–16:20.) The technicians document the recalculated sentence on form PBPP-39 and issue the formal Board decision (the "Board Decision"). (Johnson Dep. 9:8–22:15; MacNamara Dep. 15:8–16:20; Defs.' Mot. Summ.

J., Ex. 3.) A computer generated image of Barkley's name and signature appears at the bottom of each Board Decision and form PBPP-39. (Defs.' Stmt. of Facts ("Defs.' SMF") ¶ 13; Pl.'s Resp. to Def.'s SMF ¶ 13.) The Board Decision is then sent to the inmate and the Pennsylvania Department of Corrections ("DOC"). (Johnson Dep. 14:3; MacNamara Dep. 23:18–24:9.)

### A.

On February 20, 2013 the Board granted parole to Shoffner. (Pl.'s Resp. to Defs.' Req. for Admis. ("Defs.' RFA") ¶ 1.) At that time, the maximum release date on his sentence was December 14, 2013. (*Id.*) On January 27, 2014, the Bensalem Police Department arrested Shoffner and charged him with various crimes including burglary, criminal trespass, theft by unlawful taking and receiving stolen property, stemming from an incident that occurred on December 2, 2013.[2] (*Id.* ¶ 3.)

On May 19, 2014 Shoffner pled guilty to theft by unlawful taking, receiving stolen property and trespass. (*Id.* ¶ 5.) He was sentenced to two years of county probation supervision. (*Id.*) Since he pled guilty to criminal acts that occurred prior to his maximum release date, the Board recommitted Shoffner as a convicted parole violator. (Defs.' SMF ¶ 20.) Board staff took Shoffner into custody on June 5, 2014, and transported him to Graterford. (Pl.'s Resp. to Defs.' RFA ¶ 6.) The Board staff told Shoffner that it would conduct a parole hearing at Graterford to address his parole sentence. (Defs.' Mot. Summ. J., Ex. 1 ("Shoffner Dep.") 15:3–11.) Although the record does not contain evidence of any letters that Shoffner sent to Graterford staff, he claims that he wrote to his unit manager at Graterford, the superintendent and Board staff stating that he did not violate his parole because his arrest and conviction occurred after his maximum release date of December 14, 2013. (*Id.* 15:12–16:2, 19:14–19, 22:8–22.)

---

[2] Philadelphia police also arrested Shoffner on December 11, 2013 and February 9, 2014, for incidents that occurred on each of those days. The Philadelphia police charged him in both instances with, among other things, criminal trespass, theft by unlawful taking and receiving stolen goods. (Pl.'s Resp. to Defs.' RFA ¶¶ 2, 4.)

On June 23, 2014 the Board was formally notified that Shoffner pled guilty to a crime he committed prior to his maximum release date. (Hr'g Tr. 36:24–37:21.) On July 1, 2014, Shoffner met with Board employee Denise Carol and signed paperwork admitting to the new conviction and waiving his right to a parole revocation hearing. (Shoffner Dep. 23:6–8; Defs.' Mot. Summ. J., Ex. 3 ("Defs.' Dep. Ex.") D-2.) He also told Carol at that meeting that he was being wrongly incarcerated because his arrest and conviction occurred after his maximum release date. (Shoffner Dep. 44:11–45:9.) Carol told Shoffner that the Board needed to process his paperwork before he would receive a formal decision on his grievance. (*Id.* 45:10–12.)

On August 29, 2014 the Board decided that Shoffner was a convicted parole violator. (Defs.' Mot. Summ. J., Ex. 7.) The Board did, however, "in its[ ] discretion award[ ] credit to [Shoffner] for the time spent at liberty on parole." (*Id.*) Board technicians recalculated Shoffner's sentence and determined that after accounting for the award of credit for his time served on parole, his maximum release date changed from December 14, 2014 to June 5, 2014. (*Id.*; Barkley's Resp. to Pl.'s First Req. for Admis. ¶ 1.) On August 30, 2014, the DOC released Shoffner. (Pl. Resp. to Defs.' RFA ¶ 9.) Shoffner stated that he did not communicate with anyone at the Board's headquarters between June 5, 2014 and August 30, 2014. (Shoffner Dep. 45:13–46:9.)

**B.**

On February 2, 2009, the Board granted parole to Thornton and released him to a community corrections center. (Thornton Resp. to Defs.' Req. for Admis. ("Defs.' RFA") ¶ 1.) Thornton's maximum release date on his sentence was September 27, 2010. (Defs.' Mot. Summ. J., Ex. 2 ("Thornton Dep.") 12:25–13:2, 15:7–16:13.) On May 14, 2009, Thornton was arrested

on drug charges for an incident that occurred earlier that day.  (Thornton Resp. to Defs.' RFA ¶ 2.)

He was incarcerated at Graterford until his original maximum release date on September 27, 2010, with the charges from his May 14, 2009 arrest pending.  (Thornton Dep. 17:16–24.)  On July 8, 2014 Thornton was convicted of possession of a controlled substance with intent to deliver and criminal conspiracy.  (Thornton Resp. to Defs.' RFA ¶ 3; Thornton Dep. 18:15–17.)  Since he committed these offenses before September 27, 2010, his original maximum release date, Thornton was subject to recommitment as a convicted parole violator.  (Defs.' SMF ¶ 43.)

On August 6, 2014, Board staff took Thornton into custody and transported him to Graterford.  (Thornton Resp. to Defs.' RFA ¶ 4.)  Thornton told the Board employees that he did not believe he owed any further time on his parole sentence.  (Thornton Dep. 14:14–24.)  Both parties now agree that Thornton's belief was incorrect because it failed to account for the time he spent on parole prior to his May 14, 2009 arrest, which he would be required to serve unless the Board awarded him credit for that time.  (Defs.' SMF ¶ 46.)

Between August and October 2014, Thornton wrote to his unit manager at Graterford and staff members at the Board asking about "getting [his] time calculated" because he believed he was being held "well over [his] max date."  (Defs.' Dep. Exs. at D-4–11.)  He also filed an "official inmate grievance" stating that he was being held "illegally, unlawfully and unconstitutionally over [his] 6 yr. maximum judicially-imposed sentence."  (*Id.* at D-8.)

On September 19, 2014, a records supervisor at Graterford denied Thornton's grievance and stated that his previous maximum sentence ending on September 27, 2010 "will be extended due to a new conviction."  (*Id.* at D-9.)  Thornton appealed that decision.  In an "Appeal Response" form dated October 28, 2014, Wenerowicz upheld the initial denial of his grievance

and stated: "[t]he grievance officer reviewed this incident thoroughly and a proper response was remanded. You were returned to custody under a Parole warrant. You are scheduled for a hearing on the matter on 11/5/14." (*Id.* at D-14.)

On October 20, 2014, the Board was formally notified of Thornton's July 8, 2014 conviction. (Hr'g Tr. at 57:10–58:11.) On October 29, 2014, a parole staff technician at the Board wrote to Thornton and told him that the Board had received his correspondence and that a revocation hearing had been scheduled. (Defs.' Dep. Exs. at D-13.) Thornton's revocation hearing took place before a Board hearing examiner on November 5, 2014, after he waived his right to have the hearing held before a two-person panel. (Thornton Dep. 46:10–47:1.) At the hearing, Thornton reiterated his belief that he had already served all the time he owed on his sentence. The hearing examiner informed Thornton that the Board would recalculate his sentence. (Thornton Dep. 47:9–48:16.)

On December 10, 2014, the Board issued its decision, finding Thornton to be a "convicted parole violator" but "in its[] discretion award[ing] credit to [him] for the time spent at liberty on parole." (Defs.' Dep. Exs. at D-15.) Board technicians accordingly recalculated his sentence and changed his maximum release date from September 27, 2010 to July 7, 2014. (*Id.*) Thornton received a copy of the Board's decision on December 12, 2014. (Thornton Dep. 50:9–14.) He was released on December 16, 2014. (Thornton Dep. 50:9–51:18; Thornton Resp. to Defs.' RFA ¶ 7.) He never directly communicated with Barkley at any point. (Thornton Dep. 54:6–24.)

## C.

Shoffner and Thornton filed this lawsuit on January 26, 2015, and their amended complaint on July 17, 2015. (ECF No. 10.) They each assert against Barkley and Wenerowicz

7

one count under 42 U.S.C. § 1983, alleging that "falsely imprisoning [them] past their maximum date was cruel and unusual punishment in violation of the Eighth Amendment." (Am. Compl. ¶ 46.)

Barkley and Wenerowicz filed a joint motion for summary judgment on February 4, 2016, arguing that they could not have known that Plaintiffs were being held past their maximum release date because that date had not yet been calculated. (Defs.' Mot. Summ. J. at 5, ECF No. 21.) They further contend that they had insufficient personal involvement to be liable for Plaintiffs' alleged constitutional violation and are protected by qualified immunity. (*Id.* at 5–14.) Plaintiffs argue that a reasonable jury could find that Barkley and Wenerowicz were sufficiently involved in violating their Eighth Amendment rights because they took "no action to expedite the credit award decision." (Pls.' Opp. to Mot. at 5, ECF No. 23.) According to Plaintiffs, that inaction resulted in them serving time past their maximum release dates. (*Id.*)

Plaintiffs also filed a motion for summary judgment with respect to the claims against Barkley because she "knew of the systemic problem with awarding time credit" yet "failed to take action to award the street time credit promptly and failed to notify the DOC in a timely manner." (Pls.' Mot. Summ. J. at 4, ECF No. 22.) Barkley argues that an image of her signature on the Board's sentencing decisions is insufficient to demonstrate personal involvement and to subject her to liability. (Barkley's Opp. to Pls.' Mot. at 2–3, ECF No. 24.)

## II.

When ruling on a motion for summary judgment, the Court may only rely on admissible evidence. *See, e.g.*, *Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 95 (3d Cir. 1999). A Court must view the facts and draw all reasonable inferences in favor of the nonmoving party. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004). However, "an inference

based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990). The party asserting a fact "must support the assertion by . . . citing to particular parts of material in the record . . . ." FED. R. CIV. P. 56(c)(1)(A).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A party asserting that a particular fact cannot be or is genuinely disputed must support the assertion by [ ] citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1).

Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the plaintiff. *Anderson*, 477 U.S. at 252. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

"When confronted with cross-motions for summary judgment . . . the Court considers each motion separately," *Wernicki-Stevens v. Reliance Standard Life Ins. Co.*, 641 F. Supp. 2d 418, 422 (E.D. Pa. 2009), and the "governing standard does not change." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp. 2d 463, 468–69 (D.N.J. 2002) (internal citations and quotation marks omitted).

**III.**

Though Plaintiffs do not allege in their amended complaint a violation of the Constitution's Due Process Clause, their summary judgment opposition brief and presentation at oral argument reflect considerations of due process as much as the Eighth Amendment. Their arguments under either claim, which the Court addresses in turn, fail.

With regard to due process, Plaintiffs contend that the delay between when they were taken into custody and the date on which the Board was formally notified of their convictions is unreasonable and unconstitutional. (Hr'g Tr. at 59:17–60:17.) Shoffner was taken into custody on June 5, 2014, but the Board was not formally notified of his conviction until June 23, 2014. Thornton was taken into custody on August 8, 2014, but the Board did not receive formal verification of his conviction until 72 days later on October 20, 2014. Plaintiffs contend that Barkley, as Secretary of the Board, is responsible for this unconstitutional delay. (*Id.* at 59:2–18.)

Pennsylvania state courts have rejected the contention that the Board is responsible for the time between the date a parolee is taken into custody and the date the Board is formally notified of his conviction. *See, e.g*, *Taylor v. Pa. Bd. of Prob. and Parole*, 931 A.2d 114, 117–18 (Pa. Commw. Ct. 2007); *Lee v. Pa. Bd. of Prob. and Parole*, 596 A.2d 264 (Pa. Commw. Ct. 1991); *Vanderpool v. Pa. Bd. of Prob. and Parole*, 874 A.2d 1280, 1284–85 (Pa. Commw. Ct. 2005). In *Taylor*, plaintiff argued that 37 Pa. Code § 71.4 violated his due process rights because the 120-day clock should begin from the date of the Board's actual or constructive knowledge of his conviction, not its receipt of official verification of that conviction. 931 A.2d at 117. The court rejected that argument, holding that adopting the plaintiff's proposed "constructive knowledge" requirement "would impose on the Board the Herculean task of searching the

dockets of every court of record in the United States on a daily basis to discover when a parolee was convicted." *Id.* (internal citations omitted). It held that "[a] parolee has a due process right to a revocation hearing within a reasonable time after being taken into custody. . . . Reasonableness requires a balancing of the interests of a parolee with the physical capacity of the Board to act on parole revocation matters." *Id.* at 117–18 (citing *Lee*, 596 A.2d at 264). The court recognized that the Board would face "logistical problems" if the 120-day clock began to run upon actual or constructive knowledge of the plaintiff's conviction, and stated that "it is reasonable for a parole agent to wait for official verification even if the agent is aware that charges are, or may be, pending." *Id.* at 118 (citing *Lee*, 596 A.2d at 265); *see also Vanderpool*, 874 A.2d at 1284–85 (holding that a revocation hearing held within 120 days from the receipt of the official verification but more than 120 days after the Board became aware of the parolee's conviction was timely).

     After formally learning of Shoffner's conviction on June 23, 2014 and after Shoffner waived his right to a revocation hearing, the Board issued its decision granting him credit and recalculating his sentence 70 days later on August 29, 2014. (Defs.' Mot. Summ. J., Ex. 7.) Similarly, after formally learning of Thornton's conviction on October 20, 2014, the Board held a revocation hearing 16 days later on November 5, 2014. It then issued its decision recalculating his sentence 35 days after the revocation hearing on December 10, 2014—a total of 51 days after formally learning of his conviction. In responding to both Shoffner and Thornton's grievances, the Board therefore held a revocation hearing and issued its decision well within the statutorily

required 120 days from the date it was notified of their convictions.  37 Pa. Code § 71.4.[3]  Even assuming it was properly alleged, Plaintiffs cannot sustain a due process claim.

## IV.

Plaintiffs' other claim—which they did articulate in their amended complaint— is that Defendants Barkley and Wenerowicz were personally involved in violating their Eighth Amendment rights.  (Pls.' Opp. at 6, ECF No. 23.)  They allege that since the Board may award credit for time served on parole, "it is eminently foreseeable that individuals like the Plaintiffs will be incarcerated solely on parole detainers and then released months later with a Board Decision stating they didn't owe any of the time they just served." (*Id*.)  They contend that "these circumstances are unacceptable and unconstitutional because the Defendants' conduct resulted in foreseeable constitutional violations." (*Id.*)  Plaintiffs specifically allege that Barkley and Wenerowicz were personally involved and are liable because Barkley's signature appears at the bottom of the Board's Decisions and Wenerowicz responded directly to Thornton's appeal. (*Id.* at 6.)

The Eighth Amendment protects against "cruel and unusual punishment."  U.S. Const. amend. VIII.  In order to sustain an Eighth Amendment violation, Shoffner and Thornton must demonstrate that they were punished, and that their punishment was cruel and unusual.  *See Blatt v. Pa. Bd. of Prob. & Parole*, No. 12-1738, 2014 WL 3845725, at *7 (W.D. Pa. Aug. 4, 2014) (citing *Sample v. Diecks*, 885 F.2d 1099, 1107–08 (3d Cir. 1989)).

The Third Circuit Court of Appeals has held that imprisonment beyond one's term of incarceration is punitive within the meaning of the Eighth Amendment.  *Sample*, 885 F.2d at

---

[3] The statute only states that the Board must hold the revocation hearing within 120 days—not that it must issue its decision recalculating the convicted parolee's sentence within 120 days.  Regardless, in both Shoffner and Thornton's cases the Board issued its decision determining their revised maximum release date in well under 120 days.

12

1107–08; *see also Hutto v. Finney*, 437 U.S. 678, 685 (1978) (stating that imprisonment is a form of punishment under the Eighth Amendment). Cases where a prisoner is held beyond his maximum release date in violation of his Eighth Amendment rights, however, are "extremely rare." *Moore v. Tartler*, 986 F.2d 682, 686 (3d Cir. 1993).

In *Sample*, the Third Circuit held that in order to establish an Eighth Amendment violation, a plaintiff must:

> [F]irst demonstrate that a prison official had knowledge of the prisoner's problem and thus of the risk that unwarranted punishment was being, or would be, inflicted. Second, the plaintiff must show that the official either failed to act or took only ineffectual action under circumstances indicating that his or her response to the problem was a product of deliberate indifference to the prisoner's plight. Finally, the plaintiff must demonstrate a causal connection between the official's response to the problem and the infliction of the unjustified detention.

*Sample*, 885 F.2d at 1110. Shoffner and Thornton cannot sustain Eight Amendment claims if the alleged harm "result[ed] from an unforeseeable or inadvertent mistake." *Blatt*, 2014 WL 3845725, at *7 (citing *Askew v. Kelchner*, No. 04-0631, 2007 WL 763075, at *4 (M.D. Pa. Mar. 7, 2007) (internal quotation marks omitted)); *see also Sample*, 885 F.2d at 1108–09 ("The administration of a system of punishment entails an unavoidable risk of error. . . . [S]uch accidents or mistakes are a necessary cost of any prison system . . . and do not violate the [E]ighth [A]mendment.") If they can demonstrate that Barkley and Wenerowicz "acted with deliberate indifference," however, then "any punishment past [their] term is cruel and unusual." *Blatt*, 2014 WL 3845725, at *7 (citing *Granberry v. Chairman of Pa. Bd. of Prob. and Parole*, 396 F. App'x 877, 880 (3d Cir. 2010) (internal quotation marks omitted)).

### A.

To show that Barkley violated their Eighth Amendment rights, Shoffner and Thornton must first demonstrate that she had "personal involvement and knowledge of the violations

13

alleged." *Blatt*, 2014 WL 3845725, at *8 (citing *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005)). Such involvement "can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Evancho*, 423 F.3d at 353 (internal citations and quotation marks omitted).

"The doctrine of respondeat superior has been rejected as a basis for liability under section 1983." *Blatt*, 2014 WL 3845725, at *8 (citing *Rizzo v. Goode*, 423 U.S. 362 (1978)). Supervisory officials such as Barkley are therefore "only liable in civil rights actions if they affirmatively encourage or cause the violation." *Id*. A "denial of a grievance or mere concurrence in an administrative appeal process is insufficient to establish personal involvement." *Goodwine v. Keller*, No. 09-1592, 2012 WL 4482793, at *7 (W.D. Pa. Sept. 26, 2012).

Barkley did not personally check each Board decision and did not calculate any parolee's sentence during the relevant time period. (Defs.' Mot. Summ. J., Ex. 7 ("Barkley Dep.") 12:8–11, 22:12–20.) Shoffner and Thornton both concede that they were not in personal contact with Barkley during their incarceration prior to their release. (Shoffner Dep. 45:13–46:9; Thornton Dep. 54:6–24.) Their claims that Barkley violated their Eighth Amendment rights, supported only by a computer-generated image of her signature on the Board Decisions, "is insufficient to raise the inference that [she was] personally involved." *Butler v. Pa. Bd. of Prob. and Parole*, 2014 WL 1929537, at *5 (E.D. Pa. May 13, 2014) (dismissing plaintiff's complaint against Barkley because his section 1983 claim based solely on her electronic signature was insufficient to raise an inference that she was personally involved); *see also Thomas v. Barkley*, No. 13-551, 2013 WL 4786124, at *6 (W.D. Pa. Sept. 6, 2013) (dismissing complaint against Barkley because her signature on a Board decision does not "raise[ ] a plausible inference that Barkley

14

was responsible for calculating [plaintiff's] release date, or that she participated personally in any violation of [plaintiff's] rights."); *Goodwine*, 2012 WL 4482793, at *8 (noting that "[t]he denial of a grievance or mere concurrence in an administrative appeal process is insufficient to establish personal involvement [on the part of defendants]").  No reasonable jury could conclude that Barkley had knowledge of or personal involvement in Shoffner and Thornton's alleged harm.[4]

### B.

Thornton alleges that Wenerowicz violated his Eighth Amendment rights because "[h]e responded on October 28, 2014 to Thornton's complaint . . . by telling [him] he had to wait for his revocation hearing on November 5, 2014." (Pls.' Opp. at 6, ECF No. 23.)  Wenerowicz "made no effort to expedite the street time decision by contacting the Parole Board." (*Id.*)

Although Wenerowicz may have been aware of Thornton's alleged unjustified detention, he was not deliberately indifferent to his complaint.  To determine whether an official acted with deliberate indifference, the Court must examine "the scope of the official's duties and the role the official played in the everyday life of the prison." *Moore*, 986 F.2d at 686 (citing *Sample*, 886 F.2d at 1110).  "A warden, for example, [ ] may have ultimate responsibility for seeing that prisoners are released when their sentences are served, [but] does not exhibit deliberate indifference by failing to address a sentence calculation problem brought to his attention when there are procedures in place calling for others to pursue the matter." *Sample*, 886 F.2d at 1110.  An official exhibits deliberate indifference if he "recklessly disregard[s] a substantial risk of serious harm." *Granberry*, 396 F. App'x at 880 (internal citations and quotation marks omitted).  Thus, if an official is aware that, in light of his "job description or the role he or she has assumed in the administration of the prison, a sentence calculation problem will not likely be resolved

---

[4]  Since a reasonable jury could not conclude that Barkley had actual knowledge of Shoffner and Thornton's alleged unconstitutional incarceration, it is unnecessary to evaluate whether she was deliberately indifferent to their complaints.  *See Blatt*, 2014 WL 3845725, at *9.

unless he or she addresses it or refers it to others, it is far more likely that the requisite attitude will be present." *Sample*, 886 F.2d at 1110.

Deliberate indifference "typically occurs where prison officials were put on notice and then refused to investigate a prisoner's claim of sentence miscalculation." *Blatt*, 2014 WL 3845725, at *10 (citing *Moore*, 986 F.2d at 686) (internal quotation marks omitted). "[P]rison officials who actually knew of a substantial risk to a prisoner's protected right may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Granberry*, 396 F. App'x at 880 (internal citations and quotation marks omitted).

Wenerowicz was not deliberately indifferent to Thornton's claim of unjustified detention because, as both parties recognize, Thornton's belief that he did not owe any more time on his parole was incorrect. At the time Wenerowicz responded to Thornton's grievance on October 28, 2014, the Board had not yet determined whether it would give Thornton credit for the time he served on parole and the Board technicians had not yet recalculated his sentence. (Defs.' SMF ¶ 46.) It was possible, for example, that the Board Panel would use its discretion to not grant Thornton credit for the time he spent at liberty on parole.

Wenerowicz properly informed Thornton that he was scheduled "for a hearing on the matter on 11/5/2014[]" and that he "[would] be issued a new board action based on the findings of that hearing." (Defs.' Dep. Exs. at D-14.) Based on "the scope of [Wenerowicz's] duties and the role [he] played in the everyday life of the prison" as the facility manager, he properly responded to Thornton's grievance and rightly informed Thornton that the Board had scheduled a revocation hearing the following week. *See Harris v. Milgram*, No. 10-791, 2011 WL 3328513, at *5 (D.N.J. Aug. 2, 2011) (granting summary judgment for the prison administrator because plaintiff did not provide evidence that the official had any role in calculating work and

commutation credits). Since no reasonable jury could find that Wenerowicz exhibited deliberate indifference under those circumstances, Plaintiffs' claims against him cannot proceed.

## V.

Even if Defendants' conduct violated Plaintiffs' due process or Eighth Amendment rights, they are still protected by qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 129 (2009) (internal citations and quotation marks omitted).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "[I]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Bayer v. Monroe Cty. Children and Youth Serv.*, 577 F.3d 186, 193 (3d Cir. 2009) (quoting *Saucier*, 533 U.S. at 202). "It is now axiomatic that our qualified immunity analysis gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Egolf v. Witmer*, 526 F.3d 104, 110–11 (3d Cir. 2008) (internal citation and quotation marks omitted).

Since the Board held a revocation hearing and issued its decision within the 120 days prescribed by 61 Pa. Cons. Stat. § 6138(a), neither Barkley nor Wenerowicz were on notice that they were unconstitutionally detaining Plaintiffs. Further, Plaintiffs may not now base their claim on the Board's discretionary decision to grant them credit for time served on parole. That such a decision—which granted them an earlier release than they otherwise would have

17

received—changed their maximum release dates to days that already passed cannot support a constitutional violation, let alone one that is "clearly established."

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.
